Thank you, Your Honor. May it please the Court, I'm Kevin Clarkson, Counsel for the Appellants, David Thompson, Jim Crawford, Erin Downing, and District 18 of the Alaska Republican Party. The Appellants are challenging four provisions of the Alaska campaign finance laws. The Alaska's aggregate limit for non-resident contributions to candidates, Alaska's $500 individual to candidate limit, Alaska's $500 individual to group limit, and also the aggregation of political party components for purposes of party contributions. Mr. Clarkson, could you move your microphone just a little bit up for us? I will try. When you're 6'3", it's a little hard to stay close, but I'll do my best. Let's start with the non-resident aggregate in Alaska. It's unconstitutional because it's prohibited by McCutcheon. It's prohibited by this Court's decision in Van Natta. It's required to be subject to strict scrutiny under this Court's decision in Nader v. Brewer, which applied to a residency restriction as to petition circulators, and it furthers no legitimate government interest. And Alaska's claimed interest in self-governance or a Republican form of government is not a legitimate interest for First Amendment purposes. Alaska's law creates an arbitrary first-come, first-served structure under which only a token few non-residents are allowed to give to a candidate. So, for example, for a House candidate, they can only receive $3,000 per year from non-residents. Only six non-residents can give a maximum base limit $500 contribution to a House candidate. May I inquire about the state of the evidence? As I read the trial transcript, and correct me if I'm wrong, the only evidence you tendered on this issue was through your client, where he said he was not – he wanted to contribute as a non-resident and was not allowed to, right? That's true. You did not – you didn't tender any expert testimony about quid pro quo or anything else in terms of the non-resident aspect of the case? Well, I think – I'm not commenting one way or another. I just want to make sure that – No, I'm trying to remember the trial. I think the evidence about what is or was not quid pro quo corruption all goes to each of the limits that are being challenged because it's the same standard for all of them, because the government has to have the same justification for any limit that it puts in place. No, they defended based on that and based on legitimate government interest, and they had some expert testimony. But I just want to make sure that I understand the state of the record. You didn't – and you didn't have to, but you didn't tender any evidence on these questions, right? Well, I can tell you this. This record is void of any evidence to reflect that there's a correlation between residency and quid pro quo corruption. There's no evidence in this record to support that proposition at all. Well, I think there was expert testimony concerning non-resident corporations, and, of course, VECO was a foreign corporation, and there's direct evidence of VECO. But that's – I just want to make sure that I understood what you tendered in this case. Well – You're answering a question that I haven't asked. Sure. Well, no, the evidence we tender, Your Honor, goes to the heart of what the – Hebden had the burden of proof and what they were required to prove, and that is they have to justify this aggregate limit based upon the fact that it prevents quid pro quo corruption. So what the law does is it stops a non-resident, after a token few have given to a candidate, from contributing to that candidate. David Thompson, the evidence is clear. He's a former Navy SEAL, a war veteran, a retired school teacher from Wisconsin, simply wanted to give a $100 contribution to his brother-in-law who was running for state house in Alaska, and he couldn't do it. A $100 contribution. When non-residents are allowed to give in Alaska, they're limited to the same $500 base limit that non-residents are limited to – excuse me, that residents are limited to. So if the $500 base limit is sufficient to prohibit quid pro quo corruption or its appearance for a resident of Alaska, it's inconceivable that it would not do the same for non-residents of Alaska. And, yes, Hebden's theory was that complete speculation and conjecture, based on no evidence in this record, that outside industry interests could go out and find hundreds – They would aggregate their resources. Right. Well, they would violate the law because giving in the name of another is a violation of the law. It's criminal. And so they're resting their idea on criminal conspiracies of grand proportion, which would be prosecuted when Alaska's – I think their argument – I didn't read the testimony that way. I read the testimony to say that out-of-state corporations would be motivated to encourage employees and others affiliated to give sums to influence the outcome of the election for their own ends. I don't think there was any suggestion. Maybe I'm wrong, but I don't think – I didn't read the trial testimony as saying that there was going to be any criminal activity, that you were actually going to give money in the name of – Well, I think there was speculation by Professor Painter in particular that outside interests would actually funnel money through non-residents because any non-resident can only give $500. But if you just – that they would legally encourage people to go give money, there's no evidence in this record to support that as a reasonable proposition. In 16 years of data that was presented in this record, Alaska's candidates seldom reached their non-resident caps. There's no evidence that this happens. And that's true when the limit was 500 or doubled at 1,000. It doesn't matter what the limit is. There's no evidence that non-residents or outside interests have somehow tried to pool resources to funnel outside money into Alaska. And even if that was the case and that's what they're trying to prohibit, that's an improper purpose because the only thing they're allowed to prohibit is quid pro quo corruption. Outside interests legally – No, it would be your position because what they do argue is that on the non-residents is they make an argument of self-governance. And so in reading McCutcheon, McCutcheon seems clear that you must target what has been called quid pro quo corruption or its appearance. And self-governance, it would be your position. There's no room for that. And that would invalidate that. That's true. And I would also say that that violates this Court's decision in Van Natta, which specifically rejected the idea of a state protecting its republican form of government or, in that case, a voting district's republican form of government. All right. It seems to me, though, you have a little more problems with LAIR. And I signed on to a dissent in that, but the dissent is not the law. So why doesn't LAIR to cover part of what's in front of us here, whether we like it or not? Well, LAIR confirms that only a quid pro quo corruption interest is permissible. LAIR didn't involve an aggregate of the nature that's involved in this case. Well, the record does include testimony here of legislators stating that they're understanding that they received campaign contributions in return for favorable votes. And how doesn't that show at least an appearance of quid pro quo corruption? Okay. Well, if we shift to that $500 individual limit, which is more where that discussion goes, because that testimony didn't relate to the aggregate by non-residents at all. Well, except that the VICO was a foreign corporation. You can quibble. I mean, it was formed in Delaware, Wilmington, Delaware, started out of state, ended up headquartered here. So arguably the coring and cot testimony goes directly to that, doesn't it? Well, that activity was criminal activity. It was bribery and extortion. And it was indicted, prosecuted, and convicted. That is the more narrowly focused way to address bribery and extortion. There is no evidence that the VICO-Allen scandal, if you want to call it that, involved legal campaign contributions. That was completely illegal activity. So to correlate what happened in the Allen-VICO situation with a justification for a limit on what a legal law-complying citizen can contribute to a candidate is a bridge that shouldn't be crossed. There is a way to deal with criminal activity, and that's exactly how it was dealt with. Well, I think Judge Callahan is getting to the individual limit. But before we leave the non-state, I mean, the state of the evidence, if I understand it, is your client testified without dispute that he tried to give money and was denied. The only evidence as to out-of-state corruption came through expert testimony from the state, where they gave testimony about past corruption attempts from non-residents. And that's the state of the evidence in terms of tying the non-residency restriction to anti-corruption. Is that a fair statement of the record? I know you disagree with the import of that. I'm just trying to find out what's on the table. I think the evidence is clear that there – you know, the VICO situation involved individuals who are Alaska residents. I mean, even that illegal activity by VICO involved bonus schemes to citizens who were in Alaska giving legal – well, the money they were giving contributions, they were illegally acting because they were giving money that was actually somebody else's money is what they were doing. As far as legal campaign contributions, I would tell you, Your Honor, again, there's no evidence in this record of any activity by outside interests to funnel contributions from non-residents into Alaska to influence campaigns. There isn't. There is no evidence in this record. And to go to Judge Callahan's question, candidates, office holders, and donors testified that they were not and they did not appear corrupt when they received and gave $1,000 contributions. I mean, it's an excerpt of Record 40, 59 to 60, 205 to 208, 319, 329 to 330, 332, and 334. That testimony came from those folks. They said nothing about these $1,000 contributions, which is the amount of money that was approved by the Supreme Court in Buckley in 1976. Alaska's limit today is one-twentieth of what that limit was in 1976 if you convert it to 1976 dollars. And it is also. I think her question was why doesn't LAIR preclude your claims on individual limits? Because even under. It read my mind. Even under LAIR, the amount of the limit that is selected has to be narrowly focused on quid pro quo corruption. What was the limit in LAIR? The limit in LAIR in Montana? I believe the statewide limit was somewhere around $600, something of that nature. The. Sounds pretty similar. Well, and there's a similarity between the limit in Alaska now and the limit that was struck down by the U.S. Supreme Court in Randall as well, because the limit in Randall was $400 in 2006. If you take Alaska's limit and translate it to 2006, it's about $400 as well. The limit in Vermont that was struck down in Randall is about one-twentieth of the limit that was approved in Buckley. That's exactly where Alaska's limit is today. But in LAIR 2, we held that Randall versus Sorrell did not abrogate the approach set forth in Montana rights to life versus Edelman, which is a Ninth Circuit case, for assessing whether contribution limits are closely drawn. So why should we, as you argue, assess Alaska's base contribution limits under Randall? I think the Randall danger factors, even if they don't control as controlling tests, they are danger signs that are set out there as markers for the court to look at to pay closer attention to whether or not a limit is narrowly focused on quid pro quo corruption. And Alaska's limit triggers every one of those danger signs, because it's an annual limit, which, as the challengers, has the effect of being a per-cycle limit, not a per-election limit. Over the last 16 years, 98- What standard of review should be applied to the district court's evidentiary determination that the base contribution limit does not prevent candidates from amassing sufficient resources to wage effective campaigns? I think those are constitutional facts, and that means that you apply de novo. Standard of review. De novo review, because those are not historical- Even though they're evidentiary determinations that are based on facts that the district court heard. What is or is not an effective campaign is a constitutional concept. It's not a historical fact. And so there's data that went into that, but the finding and inclusion itself is a constitutional fact to which this court would review de novo. Again, Alaska's limit triggers all of those four danger signs. And the aggregate limit, to go back to Van Natta, which is a controlling decision in this circuit, this court said that a residency is not a valid distinction for determining who can make a contribution and who can't. Landel v. Sorrell and Krislav v. Redknaf, the Second Circuit and Seventh Circuit, said the same thing. Krislav involved circulators of petitions, but Landel v. Sorrell and the Second Circuit involved a limit that is almost indistinguishable from Alaska's aggregate limit. It was a proportional limit, so that when a candidate raised 25 percent of their money from outside individuals, they couldn't raise any more from outside. Alaska's is a dollar limit, but once the limit is hit, whether it's Vermont or whether it's Alaska, it's a bar from that point forward. The Second Circuit struck it down and said that an interest in protecting a right of self-governance or a right of Republican form of government was not sufficient. That's exactly what this court said in Van Natta as well. We weren't dealing with non-residents in terms of state residents. We were dealing with non-residents in terms of district residents. Actually, Van Natta involved both because it was both Oregonians who lived outside the voting district and non-residents who lived outside of Oregon who were prohibited from giving, so it was both in Van Natta. But Van Natta actually says that out-of-district residency or out-of-state residency wasn't significant of a distinction. They quoted Whitmore v. FEC for that proposition. So it's not a fair distinction to say Oregon in Van Natta, that was outside of a district distinction. The criteria that was impermissible was residency. And if you look at this court's decision, Nader v. Brewer, this court held that residency restrictions for circulators of petitions was unconstitutional and subject to strict scrutiny. That's essentially free speech activity in the area of political free speech, and it was subjected to strict scrutiny and it was found unconstitutional. It's a residency restriction. So the evidence in this record is clear that Alaska's $500 limit was selected for purposes that have nothing to do with quid pro quo corruption. There's no evidence in this record. In fact, the evidence in the record is clear that the considerations that went into picking that $500 limit had nothing to do with trying to figure out what amount of money was necessary to prevent quid pro quo corruption or its appearance. Hebden herself admitted at trial that the $500 limit, there's no magic to it because it's just guesswork. That's excerpt of Record 400. So guesswork doesn't meet the state's burden to pick an amount that is narrowly focused on quid pro quo corruption. The evidence in this case reflected that from 2002 to 2014, Senate campaigns on average spent more than they raised. They ran deficits. Winning campaigns raised more, about 17,000 in losing campaigns. Incumbents raised about 37% more than challengers. In house races, on average, they spent more than they raised and they ran deficits. Winners raised more than $8,000 than losers and incumbents raised about 15% more than challengers. The district court ignored substantial evidence in the record of... Okay, so that's your evidence that it hampers the ability for challengers to wage effective campaigns, right? Well, that plus the fact that there was evidence in the record that campaigns in recent competitive races were running out of money. And that's an excerpt of Record 100 to 101, 109 to 111, 1352 to 1375, and trial exhibits 89 to 93. So there are campaigns in Alaska that are running out of money because they can't raise enough. And what we have in Alaska is we have a limited pool of donors. We only have 736,000 people in the state, 550,000 of which are registered voters, about 500,000 who actually... show up to vote, and over 16 years, it's less than 1% that even make a campaign contribution to a campaign. That's less than 5,000 donors per election cycle. So the depth of the limit, which is the lowest in the nation for statewide races in Alaska, makes it not narrowly focused on quid pro quo corruption. If I'm right, this is two minutes left, so I should reserve my time. May I please the court? My name is Laura Fox, and I represent the director and members of the Alaska Public Offices Commission. The state of Alaska uses campaign contribution limits to try to protect the democratic ideal that elected officials should be and should appear to be accountable to their constituents, not to the highest bidder. And that's the foundation of our democracy. And the state simply asks the court to follow the long history of decisions extending from Buckley v. Vallejo to this court's recent decision in Lair v. Modell and uphold Alaska's contribution limits. So first I want to make a couple... Well, it's okay. Lair does, I think, it would appear, not to my happiness, but it would appear that it bears on the $500 limit. But would you concede that at some point it's not... You know, if it were $1, that might be a problem? Right, certainly. Where do we... $500's good, $1's not good, $10, $15, you know. Well, that's what the court said. $500's pretty low. There aren't as many states that have $500. It's true, but Alaska's among the least populous states in the nation, so it would be expected that it would have... $500 goes more here than in the Bay Area and California. Sorry, I didn't... $500 buys more here in Alaska than $500 in the Bay Area and California. Well, certainly, with the very low population in the state, we have, you know, every jurisdiction has somewhat different numbers to work with. But when does it get too low? That's what the Edelman test is designed to determine. And so if we had a lower limit and we had a different record, I think the most important piece of the test on that question is the piece that's asking about whether candidates can run effective campaigns. Because that's what the court, you know, back in Buckley, recognizing that courts don't have a scalpel to probe these distinctions between $500, $600, et cetera, the court said, well, at a certain point... There's a couple of things that, I mean, he did note that between 2002 and 2014, competitive campaigns on average spent more than they raised, and incumbents raised 37% more than challengers, and winning campaigns were campaigns that raised the most money. So he's arguing that's compelling evidence that the $500 base limit hampers the ability of challengers to wage effective campaigns. And I also noticed that Alaska's law imposes an annual versus a per-election contribution limit. So doesn't that also artificially benefit incumbents? Well, the evidence that the state put on on the other side of the equation about candidates being able to run effective campaigns was there was more evidence. The district court credited the state's evidence over the evidence that you've mentioned there. There was also some problems with various specific pieces of that evidence, like the evidence about campaigns running out of money was flawed because it didn't account for other things that candidates do with leftover money at the end of campaigns. I think the state's contrary evidence was that 80% of campaigns had leftover money that they transferred, you know, gave charitable contributions or transferred to... I'm assuming then that you would view the standard of review differently as it applies to the district court's evidentiary determinations that the base contribution limit does not prevent candidates from amassing sufficient resources to wage effective campaigns because he said it was de novo, and I'm assuming that you would have a different view on that standard of review. That's correct, Your Honor. I think just in Laird and the court's most recent decision, just if you look at the standard of review section of Laird, the court said, well, it's true in a First Amendment case that maybe there's not as much deference as there would be normally to a district court's factual findings, but there's still a level of deference there. It's not de novo review. And so the court should, you know, although it might be delving a little more into the record than it might otherwise looking at a factual finding, the court should still be deferring to the district court. The district court heard all this evidence, weighed it, heard the experts, heard the cross-examination and the problems with the pieces of evidence that the plaintiffs put forward, and so the court should give a lot of weight, I think, to the district court's findings. Because I want to give you an opportunity to respond, I'm going to sort of say what... I do, I'm most troubled by the non-resident. That in McCutcheon, the Supreme Court stated that any regulation of campaign contributions must target what we have called quid pro quo, corruption in its appearance. How does that unqualified language provide any room for your stated self-governance interest in enacting the non-resident aggregate limit? You argue that Alaska has a compelling interest in protecting Alaska's system of self-government from outside control through the non-resident aggregate limit. In my view, well, I mean, how is that just not another way of saying that Alaska does not want its state officials to feel pressure to respond to the influence of out-of-state entities? Does such an interest revert to the now rejected state interest in preventing undue influence and access? Well, so for one thing, in McCutcheon, the court wasn't actually presented with this argument, so... Okay, but you argued self-governance. Right, right. So I'm just saying McCutcheon didn't reject that rationale because McCutcheon wasn't presented with that rationale about the state's interest in our federal system of preserving its separate identity as a separate state. But it pretty specifically said quid pro quo corruption or its appearance. That's the standard. Right, but again, the court wasn't confronted with this particular rationale, so its holding didn't... But it was confronted with other suggestions, such as leveling the playing field, right? Right. And it rejected those. So it was given some other reasons for control or regulation, and it rejected those, and it approved quid pro quo or appearance of quid pro quo corruption. Shouldn't we take that to be the exclusive ground upon which First Amendment liberties are limited? Well, the non-resident limit can be upheld on those grounds, too. But so in McCutcheon, the court was presented with a variety of rationales. It accepted only one of them, but it only rejected, really, the ones that were before it because those were the only ones it had the opportunity to consider. Depending on how you parted your hair on the left or the right. It didn't reject what color shoes were worn. I mean, it didn't reject a whole bunch of things, but it did reject everything but quid pro quo corruption. Correct? That's correct. Shouldn't we take that as an indication of the only valid basis for limiting First Amendment rights? I think the court should still entertain other rationales that make sense and that weren't actually in front of the court and actually rejected in that. Has any court accepted your self-government or Republican form of government argument? No, Your Honor. The closest analogy is the Blooming case, which... Van Natta sort of didn't accept it either, right? Van Natta was also distinguishable in that it was dealing with out-of-district contributions so that the rationale doesn't apply in the same way in that situation because... If you're out of the county, you're a different kind of person than if you're out of the state. That's more analogous to, for instance, one state's federal representatives in the U.S. Congress or U.S. Senate because the entire country, although not everyone can vote for Alaska's senators or congresspeople, everybody is governed by that same political body, whereas... And so that's the situation when you're talking about out-of-district versus in-district within the state. What you're saying is that out-of-state persons who have interests in Alaska and can't vote here because they're out-of-state can't have their views presented to the people who do vote because they're out-of-state. Well, just that... Well, in this context, when we're talking about campaign contributions as opposed to other forms of expression, like, for instance, the petition circulator law that the plaintiffs were referring to, that's a more direct, more core form of First Amendment expression than campaign contributions. So we're operating in this universe where we're not in strict scrutiny. The government's interest doesn't have to be quite as high as in other contexts. And in this context of campaign contributions, we recognize that they influence... And Alaskans are entitled to prefer that their legislators be beholden to Alaskans. I mean, the voices of Alaskans could easily... Well, maybe you need to convince the Supreme Court of that. Well, Your Honor, as I said, the non-resident limits are also justified by the quid pro quo corruption interest. Let's talk about the evidence. Let's talk about the state of the evidence on quid pro quo vis-a-vis the non-resident restriction. Sure, Your Honor. So the state's point is not that non-residents are inherently corrupt, but the Alaska Public Offices Commission has a limited ability to police the activities of non-residents. And Alaska's special characteristics, like its natural resources, make it a prime target for corruption and for outside interest and interference. And without any non-resident limits, industry interest, like in the VECO scandal, could engage in contribution schemes involving non-residents that APOC would have... The Alaska Public Offices Commission would have a very difficult time policing or looking into or investigating at all. Legislators... Just to make sure I understand the state of the evidence. You had expert testimony, at least by two people, about the non-resident issue. And you had testimony by a legislator who talked about, I think, some kickback with the Alaska or purported kickback with the Alaska Railroad. You had testimony about historical attempts to influence. And then you threw in the VECO scandal, which may or may not be distinguishable because it was criminal. Is that the state of the evidence on this? Yes, Your Honor. We don't have any direct evidence that these kinds of schemes involving non-residents are actually happening. But the non-resident limits have been in place for a long time. So with those non-resident limits in place, you couldn't have the situation where, for example, legislators could go outside and fundraise and get their entire campaign budget essentially covered by non-resident out-of-state interests, perhaps directed from a particular source, perhaps affiliated with a particular source. And that can't currently happen, and it's not happening, because these limits have been in place for many years. So we do have Dr. McBeth's testimony about the history. We have Dr. Painter's testimony about the different kinds of schemes that people will engage in and the difficulty of detecting them. And we have the VECO scandal. And so the state only needs to show that the risk of corruption that it's addressing is not illusory. And this evidence, this body of evidence, is sufficient to show that. I don't think Mr. Clarkson's response to the VECO scandal was criminal activity and not directed toward campaign contributions. Well, some of it did involve campaign contributions. And the fact that it was criminal doesn't mean that contribution limits are not also an effective way to address the same sort of problem. I mean, the scandal shows that Alaska's politicians are not so pure that corruption is a non-concern. And then also, contribution limits are an important supplement to criminal bribery laws, both because bribery is difficult to detect and prosecute, as Dr. Painter testified about, and also because aggressive criminal policing and criminal prosecution of this kind of contribution-related corruption would actually, in some ways, be more chilling of First Amendment rights than just having contribution limits. Because the difference between a corrupt contribution and an innocent contribution lies in the motives and private communications of the candidate and the contributor. And having the government coming in and aggressively inquiring into the motives of everyone who's contributing money would actually be, in some ways, more chilling of free speech than just putting a cap to put a limit on the potential for corruption by contributions. Let me ask you about, okay, let's just, for purposes of argument, let's just assume that Layer 3 covers your individual-to-candidate challenge. But then you've got your individual-to-group contribution, which is also being challenged. It would appear to me that that presents a closer issue and isn't directly covered by Layer, because it reflects a more attenuated risk of quid pro quo corruption or its appearance on the base limit. In McCutcheon, the Supreme Court rejected a limitation that capped aggregate contributions to political action committees. Because money was not transacted directly between contributor and candidate, there was not the same risk of quid pro quo corruption or its appearance. So while the government articulated its compelling interest as preventing circumvention of the base limits, the court found that the government had not carried its burden, demonstrating that aggregate limits furthered its anti-circumvention interest. So tell me how you survived that challenge. Well, so we've cited the California Medical Association case, which is older than McCutcheon, but which neither McCutcheon nor any other U.S. Supreme Court case has overruled. And that was a case about individual-to-group contribution limits. And it rejected the kind of arguments the plaintiffs make here that, like, contributing to the group isn't going to create a quid pro quo because you're not contributing directly to the candidate. So that case recognized that groups can be used to circumvent the base limit and end up serving just as conduits for excess individual contributions. So that case recognized that and upheld a limit like that and rejected the kinds of arguments that are being put forward against that. And the Supreme Court has not overruled that decision and has cited it favorably. So if the base limit is constitutional, then measures to stop people from easily circumventing it or at least put limits on the ways that people can easily circumvent it are also constitutional. And I can also touch— So you would just say that California medical remains binding law, that McCutcheon didn't overrule it? Yes, Your Honor. And I can also touch briefly on the political party limits. And the plaintiffs have never challenged the limits themselves and said they're challenging sort of the administration of the limits, the fact that the state considers contributions of party subgroups to be contributions of the party. That makes sense. The subgroups of the party are connected to the party, dependent on the party. There's a higher limit for political parties, significantly higher than for other groups. So the state has to have some way of determining what contributions count as party contributions. And the state's way of doing that makes sense. Other kinds of groups don't have higher limits, so the reason that the state does this wouldn't apply to, for example, labor unions, is the example they use. And so just to get back to the individual limits, as has already been discussed here, LAIR is controlling and establishes certain principles and forecloses certain arguments for purposes of this case. And the court said in LAIR that it shouldn't be in the business of fine-tuning contribution limits for states. And it rejected at least three of the major arguments that the plaintiffs are putting forward here. So the plaintiffs argue that the court should use Randall. LAIR makes clear that the court should use Edelman for the legal standard. The plaintiffs argue that the court should inquire into the motives of the people that proposed and enacted Alaska's limits. LAIR specifically rejected that argument. The plaintiffs argue that the state has to justify the change from its prior limit to its current limit, and LAIR specifically rejected that approach also. So LAIR takes all of those arguments off the table. And here our evidence, the state of Alaska's evidence, was at least as good, and in many cases better, than the evidence that was considered sufficient to uphold very similar limits in LAIR. And so really the only reason that it would make sense for the court to uphold Montana's limits in LAIR, strike down Alaska's limits here, would be if the record showed that candidates weren't able to effectively campaign. And that's not what the record showed. That's not what the district court found. We had candidates testify. We had political consultant experts testify. We had data. It all showed that candidates can still effectively campaign in Alaska. And the plaintiffs have barely asserted that the contrary is true on appeal, or explained why those findings were clear error. So I guess if the court doesn't have any further questions about any of the specific limits, the state would ask that the court follow the long history of decisions extending since Buckley and uphold Alaska's reasonable contribution limits to strike a balance and protect the democratic ideal that candidates should be and elected officials should be accountable to their constituents, not to high-dollar donors. Thank you. Thank you, counsel. We'll hear rebuttal. Thank you, Your Honor. LAIR did not involve a non-resident aggregate cap. It didn't. And it established that only quid pro quo corruption will suffice, just like McCutcheon. In McCutcheon and Buckley, the court rejected the concept that government may restrict the speech of some elements of our society in order to enhance the relative voice of others. This is a concept, according to the words of Justice Kennedy, that is foreign to the First Amendment. That's exactly what Alaska's aggregate limit does. Government's primary tool, according to McCutcheon, for preventing quid pro quo corruption is the base limit. An aggregate limit is just a layer on top of the base limit. And what McCutcheon says is what the government can do, because in Buckley they allowed an aggregate because there were legal avenues that people could pursue to circumvent the base limit. By the time McCutcheon came around, those avenues had been cut off by surgical legislation by Congress. McCutcheon said you can't have a base limit layered on top of that surgical restrictions on the avenues of corruption, and then a third layer, which is an aggregate. At that point, the aggregate has no utility and it only burdens free speech. Alaska has a three-layered system. They have a base limit. They have surgical restrictions against avenues of restriction. You can't earmark, you can't give them the name of someone else. And then they have an aggregate on top of that. That is exactly what McCutcheon says is not permissible. In terms of the individual-to-group limit... Go ahead. Well, California Medical Association does appear to be good law. It doesn't appear to be overruled by McCutcheon. And if that's the case, in that case the court upheld such limits as furthering the governmental interest and preventing the actual or apparent corruption of the political process because they prevent contributors from evading the limit on contributions to candidates by channeling funds through multi-candidate political campaigns. So it's sort of an anti-circumvention argument. Again, Alaska already has laws in place to prevent that type of circumvention. There's a law in Alaska that prohibits earmarking of money. So my friend at the next table's comment that you could just give money to a group and the group could pass the money to a candidate is not true. It's illegal. It can't be earmarked. If you give money to a group, you have to just hope that they'll give money to that candidate. And you have to share attribution for that $1,000 contribution from the group to the candidate. You have to share attribution with everybody else who gave money to that group. I think Alaska, I think they argued that a group can be two people. So there was the, like a husband and wife could be a group. That is true. They could, I guess, they could somehow do $500 more. Well, it's true. If there were any evidence of that taking place in Alaska, I mean, conceivably, theoretically, that's possible, Your Honor. Yes, it's true. But there's no evidence that it would happen. And think about it. Just to pass $25,000 to a candidate of your choice through multiple two-person groups, it would take 50 people engaging in criminal activity in order to accomplish that. So that's what McCutcheon called a grand conspiracy of criminal activity that is beyond the realm of reasonable expectation. They called it conjectural and speculative in McCutcheon. Thank you, Kevin. Thank you, Your Honor. Thank you both for your arguments today. The case has already been submitted for decision, and we will be in recess for the morning. I'll rise. This board, for this session, stands adjourned.
judges: Thomas, Callahan, Bea